# SUPPORTING DOCUMENTS

**Copy**

(Page 2 of 99)

Cop

Cop

# ADJUSTABLE RATE NOTE
#### (6-Month LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

February 20, 2007                    BREA                        CA    92621
        [Date]                         [City]                          [State]

142 PARK PLACE, Irvington, NJ  07111
                    [Property Address]

## 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 289,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  FGC Commercial Mortgage Finance, DBA Fremont Mortgage   ITS SUCCESSORS AND/OR ASSIGNS
I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          9.650 %. The interest rate I will pay will change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS
    **(A) Time and Place of Payments**
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the first day of each month beginning on  April 01, 2007 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  March 01, 2037          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at  2727 East Imperial Highway, Brea, CA  92821

or at a different place if required by the Note Holder.

    **(B) Amount of My Initial Monthly Payments**
    Each of my initial monthly payments will be in the amount of U.S. $ 2,461.76          . This amount may change.

    **(C) Monthly Payment Changes**
    Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index  - Single Family - Freddie Mac UNIFORM INSTRUMENT

VMP -815N (0404)              Form 5520 3/04
        VMP Mortgage Solutions (800)521-7291
Page 1 of 4

Original Note & Riders

Copy

Cop

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of March, 2009 , and may change on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six month U.S. dollar denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available 45 days first before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 990/1000 percentage point(s) ( 6.990 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 12.650 % or less than 9.650 %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than 1.500 from the rate of interest I have been paying for the preceding period. My interest rate will never be greater than 15.650 % or less than 9.650 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.



[Page 4 of 59]

Cop

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of _____ 15 _____ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _____ 5.000 _____ % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

 815N (0404)

Form 3510 3/0 
Initials

Copy

Cop

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
JAMES BULGER                    -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                    -Borrower

*[Sign Original Only]*

VMP-815N (0404)                    Page 4 of 4                    Form 5520 3/04

Cop

Pay to the order of
Fremont Investment & Loan
(Without Recourse )

FGC Commercial Mortgage Finance
DBA Fremont Mortgage
Doug Pollock
Assistant Vice President

Pay to the order of
without recourse.

Fremont Investment & Loan
Doug Pollock
Assistant Vice President

Copy

Copy

I HEREBY CERTIFY THE FOREGOING
TO BE A TRUE COPY

PHILIP THIGPEN
ESSEX COUNTY REGISTER

Philip Thigpen
Register

June 21, 2013
Date

## RECORDING INFORMATION SHEET

ESSEX COUNTY REGISTER'S OFFICE
HALL OF RECORDS , ROOM 130
465 MARTIN LUTHER KING Jr. Blvd
NEWARK NJ 07102

| INSTRUMENT NUMBER: | DOCUMENT TYPE : |
|---|---|
| 7032926 | **MORTGAGE** |

Official Use Only

CAROL A. GRAVES, REGISTER
ESSEX COUNTY, NJ

INSTRUMENT NUMBER
7032926
RECORDED ON
March 9, 2007  02:39 pm
BOOK:12015 PAGE:9228

CC

Return Address (for recorded documents)

FGC COMMERCIAL MORTGAGE FINANCE

PO BOX 34078

FULLERTON CA 92834

| No. Of Pages (excluding Summary Sheet) | | 24 |
|---|---|---|
| Recording Fee (excluding Transfer Tax) | | $260.00 |
| Realty Transfer Tax | | $0.39 |
| Amount Charged     (Check # 825) | | $260.39 |
| Municipality | IRVINGTON | |
| Parcel Information | Block | |
| | Lot | |
| First Party Name | JAMES BULGER | |
| Second Party Name | FGC COMMERCIAL MORTGAGE | |

Additional Information (Official Use Only)

MAIL COPY _____
NO COPY _____
ENVELOPE _____

ADDITIONAL STAMPINGS _____

3-5-2011
ASSG'T REC'D
BK ____ PAGE 2547

***************** DO NOT REMOVE THIS PAGE ********************
COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF ESSEX COUNTY FILING RECORD
***************** RETAIN THIS PAGE FOR FUTURE REFERENCE. ***************

(Page 10 of 95)

Cop

Return To:
FGC Commercial Mortgage Finance, DBA Fremont Mortgage
P.O. BOX 34078
FULLERTON, CA 92834-34078

Prepared By:

Barbara Licon

—————————————[Space Above This Line For Recording Data]—————————————

# MORTGAGE

MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated February 20, 2007 , together with all Riders to this document.

(B) **"Borrower"** is JAMES BULGER AND GWENDOLYN L. BULGER

Borrower is the mortgagor under this Security Instrument.

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS       Form 3031 1/01

-6A(NJ)(0505).02

Page 1 of 16        Initials

VMP MORTGAGE FORMS - (800)521-7291

Copy

Cop

## COMMITMENT
### Schedule A - Description

File No. ▮▮▮▮▮▮▮

ALL that certain lot, parcel or tract of land, situate and lying in the Township of Irvington, County of Essex and State of New Jersey being more particularly described as follows:

BEGINNING at the southerly line of Park Place at a point distant Easterly two hundred (200) feet from the intersection of the said side of Park Place with the Easterly side of Yale Avenue; thence running

1)   South thirty (33) degrees thirty eight and one-half (38.5) minutes East, one hundred and twenty-five (125) feet; thence

2)   North fifty-six (56) degrees twenty-one and one-half (21.5) minutes East, fifty (50) feet; thence

3)   North thirty-three (33) degrees, thirty-eight and one-half (38.5) minutes West, one hundred twenty-five (125) feet to Park Place; and thence

4)   South fifty-six (56) degrees twenty-one and one-half (21.5) minutes West, fifty (50) feet to the point and place of BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY:  Also known as Lot 5 in Block 333 on the Township of Irvington Tax Map.

Copy

Cop

**(D) "Lender"** is FGC Commercial Mortgage Finance. DBA Fremont Mortgage ITS SUCCESSORS AND/OR ASSIGNS

Lender is a    CORPORATION
organized and existing under the laws of    CALIFORNIA
Lender's address is 2727 East Imperial Highway, Brea, CA  92821

**(E) "Note"** means the promissory note signed by Borrower and dated February 20, 2007
The Note states that Borrower owes Lender Two Hundred Eighty-Nine Thousand  and 0/100ths                                                                    Dollars
(U.S. $289,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than March 01, 2037

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

-6A(NJ) (0605).03                          Page 2 of 18                    Initials                    Form 3031 1/01

Copy

Cop

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the County                          of                          Essex                          :

[Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART THEREOF

Property Account Number:                                                   which currently has the address of
142 PARK PLACE                                                                                                          [Street]
Irvington                                                   City, , New Jersey 07111          [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

-6A(NJ) (0005) 02                          Page 3 of 15                          Initials:                          Form 3031 1/01

Copy

Cop

(Page 14 of 95)

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.
currency. However, if any check or other instrument received by Lender as payment under the Note or this
Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments
due under the Note and this Security Instrument be made in one or more of the following forms, as
selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or
cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a
federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section 15.
Lender may return any payment or partial payment if the payment or partial payments are insufficient to
bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan
current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial
payments in the future. If Lender accepts such payments, it shall apply such payments at the time such
payments are accepted. No offset or claim which Borrower might have now or in the future against Lender
shall relieve Borrower from making payments due under the Note and this Security Instrument or
performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest
due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments
shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts
shall be applied first to late charges, second to any other amounts due under this Security Instrument, and
then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a
sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and
the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received
from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be
paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or
more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall
be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under
the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due
under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due
for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a
lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c)
premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance
premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage
Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow
Items." At origination or at any time during the term of the Loan, Lender may require that Community
Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and
assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to
be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives
Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's
obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be
in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

-6A(NJ) (0005).02                          Page 4 of 15                          Form 3031 1/01

Copy

Cop

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(NJ) (0008).02                    Page 6 of 16                              Form 3031 1/01

Cop

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6A(NJ) (0505).02                    Page 6 of 15                              Form 3031 1/01

Copy

Cop

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(NJ) (0005) 02                    Page 7 of 16                                        Form 3031 1/01

Copy

Cop

(Page 18 of 35)

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6A(NJ) (0005).02                        Page 8 of 15                        Form 3031 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

-6A(NJ) (0305).06                    Page 9 of 15                    Initials:_____    Form 3051  1/01

Cop

(Page 20 of 39)

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note) Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(NJ) (0005)02                        Page 10 of 15                        Form 3031 1/01

Copy

Cop

(Page 21 of 55)

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. These conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

-6A(NJ) (0005).02                    Page 11 of 15           Initials: _____        Form 3031 1/01

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

6A(NJ) (0005) 02                    Page 12 of 16                    Form 3031 1/01

Copy

Cop

(Page 23 of 95)

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

-6A(NJ) (0308.01)                     Page 13 of 15                              Form 3031 1/01

Copy

Cop

(Page 24 of 35)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.
THERE ARE NON-OBLIGATED SIGNER(S) WHO MUST EXECUTE THIS DOCUMENT
Signed, sealed and delivered in the presence of:

_____    _____ __(Seal)
                            JAMES  BULGER               -Borrower

_____    _____ (Seal)
HOWARD J WASSERMAN          GWENDOLYN J BULGER           -Borrower
AN ATTORNEY AT LAW
OF THE STATE OF NEW JERSEY

                           (Seal)   _____ (Seal)
                           Borrower                      -Borrower

                           (Seal)   _____ (Seal)
                           Borrower                      -Borrower

_____    (Seal)   _____ (Seal)
                           Borrower                      -Borrower

@ -6A(NJ) (0405).02          Page 14 of 15              Form 3031 1/01

Copy

(Page 23 of 39)

Cop

STATE OF NEW JERSEY,    *Morris*    County ss:

On this *20th* day of *February 2007*, before me, the subscriber, personally appeared

*James Bulger + Gwendolyn L. Bolger*

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein expressed.

Notary Public

HOWARD J WASSERMAN
AN ATTORNEY AT LAW
OF THE STATE OF NEW JERSEY

-6A(NJ) (0008).02                     Page 16 of 16                     Form 3031 1/01

Copy

Cop

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this 20th  day of February, 2007
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
FGC Commercial Mortgage Finance, DBA Fremont Mortgage
IT'S SUCCESSORS AND/OR ASSIGNS

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at  142 PARK PLACE, Irvington, NJ  07111

[Property Address]

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES IN THE
INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE
INTEREST RATE WILL RESULT IN LOWER PAYMENTS.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of           9.550 %. The Note provides
for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of March, 2009
and on that day every   sixth      month thereafter. Each date on which my interest rate
could change is called a "Change Date."

**MULTISTATE ADJUSTABLE RATE RIDER - Single Family**
-899R (0402)                                 1/01
Page 1 of 5       Initials:
VMP Mortgage Solutions, Inc.
(800)521-7291

Cop

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index  The "Index" is:   the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the WALL STREET JOURNAL.

The most recent Index figure available as of the date: ☒ 45 days ☐ ___ __ _____ before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 990/1000                                         percentage points ( 6.990 %) to the Current Index. The Note Holder will then round the result of this addition to the ☒ Nearest ☐ Next Highest ☐ Next Lowest one-eighth of one percent point                    (            0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

☐ **Interest-Only Period**

The "Interest-only Period" is the period from the date of this Note through N/A        . For the interest-only period  after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

The "Amortization Period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Copy

Cop

**(D) Limits on Interest Rate Changes**
**(Please check appropriate boxes; if no box is checked, there will be no maximum limit on changes.)**

☐ (1) There will be no maximum limit on interest rate changes.
☒ (2) The interest rate I am required to pay at the first Change Date will not be greater than                12.650 % or less than                9.650 %.
☒ (3) My interest rate will never be increased or decreased on any subsequent Change Date by more than One  and  500/1000
   percentage points (                              1.5 %) from the rate of interest I have been paying for the preceding period.
☒ (4) My interest rate will never be greater than                 15.650 %, which is called the "Maximum Rate."
☒ (5) My interest rate will never be less than                9.650 %, which is called the "Minimum Rate."
☒ (6) My interest rate will never be less than the initial interest rate.
☒ (7) The interest rate I am required to pay at the first Change Date will not be greater than                12.650 % or less than                9.550 %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than One  and  500/1000
   percentage points (                              1.5 %) from the rate of interest I have been paying for the preceding period.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

899R (0402)                    Page 3 of 5              Initials

**Copy**

Cop

(Page 29 of 95)

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**899R** (0402)                    Page 4 of 5                    Initials:

Copy

Cop

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.
**   There are non-obligated signer(s) who must execute this document.   **

_____ (Seal)          _____ (Seal)
JAMES   BULGER          -Borrower          GWENDOLYN L BULGER          -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                    -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                    -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                    -Borrower

-899R (0402)                    Page 5 of 5

Copy

Cop

(Page 31 of 95)

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 20th        day of February, 2007        ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the 'Borrower') to secure Borrower's Note to FGC Commercial  Mortgage
Finance. DBA Fremont Mortgage

(the

"Lender") of the same date and covering the Property described in the Security Instrument
and located at: 142 PARK PLACE, Irvington, NJ  07111

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter
attached to the Property to the extent they are fixtures are added to the Property description,
and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used or
intended to be used in connection with the Property, including, but not limited to, those for
the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light,
fire prevention and extinguishing apparatus, security and access control apparatus, plumbing,
bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers,
disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades,
curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain
a part of the Property covered by the Security Instrument. All of the foregoing together with
the Property described in the Security Instrument (or the leasehold estate if the Security
Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security
Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has
agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations
and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow
any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in
addition to the other hazards for which insurance is required by Section 5.

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3170 1/01
-57R (0411)
Page 1 of 3        Initials:
VMP Mortgage Solutions, Inc.
(800)521-7291

Copy

Cop

E. "BORROWER'S RIGHT TO REINSTATE" DELETED. Section 19 is deleted.

F. BORROWER'S OCCUPANCY. Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

G. ASSIGNMENT OF LEASES. Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION. Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

-57R (0411)                    Page 2 of 3                    Initials:                    Form 3170 1/01

Copy

Cop

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.
** HERE ARE NON-OBLIGATED SIGNER(S) WHO MUST EXECUTE THIS DOCUMENT **

_____ (Seal)
JAMES BULGER          -Borrower

_____ (Seal)
GWENDOLYN L BULGER      -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

-57R (0411)                    Page 3 of 3                    Form 3170 1/01

MERS phone (800) 646-6377

## Assignment of Mortgage
### Know all Men by these Presents:

That **Mortgage Electronic Registration Systems, Inc. as nominee for FGC Commercial Mortgage Finance, DBA Fremont Mortgage its successors and assigns**

located at **1901 E Voorhees Street, Suite C, Danville, IL 61834**
herein designated as the Assignor, for and in consideration of the sum of ONE DOLLAR AND 00/100 ($1.00) and other good and valuable consideration, the receipt whereof is hereby acknowledged, does by these presents assign to

### HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE HOLDERS OF THE ELLINGTON LOAN ACQUISITION TRUST 2007-1, MORTGAGEPASS-THROUGH CERTIFICATES, SERIES 2007-1

located at **961 Weigel Drive, Elmhurst, IL 60126**
herein designated as the Assignee, a certain Mortgage recorded  03/09/2007 , made by James Bulger and Gwendolyn L. Bulger  on lands located in the Town of Irvington in the County of  ESSEX and State of New Jersey, to secure payment of the sum of $289000.00 Dollars which mortgage is recorded or registered in the office of the Clerk or Register of  ESSEX County in Book 12035 of Mortgages on page 9228.

Together with the Bond, Note or other Obligation therein described, and the money due and to grow due thereon, with the interest. To have and to hold the same unto the said Assignee forever, subject only to all the provisions contained in the said Mortgage and the Bond, Note or other Obligation.  And the said Assignor hereby constitutes and appoints the Assignee as the Assignor's true and lawful attorney, irrevocable in law or in equity, in the Assignor's name, place and stead but at the Assignee's cost and expense, to have, use and take all lawful ways and means for the recovery of all the said money and interest; and in case of payment, to discharge the same as fully as the Assignor might or could do if these presents were not made.  This assignment is without recourse for any reason whatsoever.

In all references herein to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.

**In Witness Whereof,** the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper to corporate officers and its corporate seal to be hereto affixed this ___27___ day of ___June___ 20_11_

Mortgage Electronic Registration Systems, Inc. as nominee for FGC Commercial Mortgage Finance, DBA Fremont Mortgage its successors and assigns

BY: _____
Aida Duenas
Assistant Secretary

State of __California__
County of __Ventura__ )

On __June 27, 2011__ before me, __Eric T Way, Notary Public__

personally appeared __Aida Duenas__ _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of __California__ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

ERIC T. WAY
Commission # 1835518
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2013

**RECORD & RETURN**
**ZUCKER, GOLDBERG & ACKERMAN, LLC**
200 Sheffield Street, Suite 301
P. O. Box 1024
Mountainside, NJ 07092-0024

C_151989_AOM1X2_C



## LOAN MODIFICATION AGREEMENT

Loan No.: ■■■■■■

Borrower(s):  James Bulger

Property:  142 Park Pl
Irvington, NJ 07111

Custodian:  ■■■■■■

Inv. No.: ■■■■■■

This Loan Modification Agreement ("Agreement") is made this 11th day of December, 2008 between Wilshire Credit Corporation ("Wilshire") as servicer for the owner of the above loan, and James Bulger ("Borrower(s)").

### FACTS

Wilshire is the servicer of the above Loan arising from a promissory note in the original principal amount of $289,000.00 secured by a deed of trust or mortgage on the above Property.  Prior to any modifications, the amount owing on this Loan as of 12/1/2008 is as follows:

| | |
|---|---|
| Principal | $286,185.05 |
| Interest | 4,601.52 |
| Advances Posted to Account | 164.50 |
| Fees and Charges Posted to Account | 861.62 |
| Unapplied Funds | 42.92 |
| | |
| Total | $291,769.77 |

There may be additional amounts owed if Wilshire has not yet posted charges to the Loan, if prior payments have been made with non-sufficient funds, or taxes and insurance have not been paid.  These amounts plus any future fees, expenses or charges as permitted by the Note, Deed of Trust/Mortgage or by law are referred to as "Additional Charges."

Borrower(s) are in default under the Note and Deed of Trust/Mortgage.

### AGREEMENT

For good and valuable consideration, the Borrower(s) and Wilshire agree as follows:

1. <u>Acknowledgement</u>.  The above Facts are true.

2. <u>Timely Receipt of Signed Agreement</u>.  Wilshire must receive this Agreement, signed by all Borrower(s) together with any funds that were required to be paid upon signing the Agreement, in Wilshire's office by 12/26/2008. No changes may be made to this Agreement. Wilshire is under no obligation to renew or extend this Agreement.

3.  Definitions.

    3.1 The term "Additional Charges" means additional amounts, if any, owed if Wilshire has not yet posted charges to the Loan, if prior payments have been made with non-sufficient funds, or taxes and insurance have not been paid, plus any future fees, expenses or charges as permitted by the Note, Deed of Trust/Mortgage or by law.

    3.2 The term "Note" includes the original note and any riders, renewals, extensions, modifications and loan adjustments thereof.

    3.3 The term "Deed of Trust/Mortgage" includes the deed of trust or mortgage, together with any riders, addendums, modifications, amendments, or adjustments thereto.

    3.4 The term "Maturity Date" means the original maturity date specified in the Note on which date the Loan is to be paid in full, unless such date is changed in this Agreement. If the date is changed in this Agreement, then the Maturity Date is the new date specified.

4.  Loan Modification. The Note is hereby modified as follows:

### INCREASE IN PRINCIPAL

The amount of the principal obligation owed under the Note is hereby increased by $4,766.02. The increase arises from $4,601.52 of unpaid interest and $164.50 of certain unpaid advances made by Wilshire.

### DEBT FORGIVENESS

The amount of the current debt is hereby reduced by $861.62. This reduction of debt consists of:

| | |
|---|---|
| Principal | $0.00 |
| Interest | 0.00 |
| Advances Posted to Account | 0.00 |
| Fees and Charges Posted to Account | 861.62 |
| Total | $861.62 |

### INTEREST RATE ADJUSTMENT

Effective 12/1/2008, the interest rate on the principal amount of the Note will be fixed at 7% per annum and will remain in effect until the scheduled change date that is after the date that is 24 months after the date of this modification. After this fixed-rate period, the terms of the Note and Deed of Trust/Mortgage regarding the interest rate, including terms providing for any change in the rate of interest, shall remain the same. The interest rate then will adjust on the next scheduled change date as

set forth in the Note. If this is the initial interest rate change, the initial interest rate change limits as set forth in the Note will apply. For all other interest rate changes, the subsequent interest rate change limits as set forth in the Note will apply.

## PAYMENT

In addition to the principal and interest obligation of $1,971.70, Borrower(s) are required to make monthly escrow payments of $706.86. Borrower(s) therefore will pay this Note in regular payments of $2,678.56 for the 24 month fixed-rate period. Such installments shall be due and payable on the 1st day of each month beginning 1/1/2009. The escrow portion of the monthly payment is subject to change due to increases or decreases in taxes and/or insurance premiums, and the monthly payment above may be changed by Wilshire to reflect such increase or decrease.

After this 24 month fixed-rate period, Borrower will pay the Note in regular monthly payments on the 1st day of each month until the Maturity Date. If this Loan Modification Agreement increased the principal amount owing on this Loan, the monthly payment likely will be greater than the original monthly payment. Wilshire or a subsequent servicer will advise the Borrower(s) of the monthly payment that will be required to be paid.

5. <u>Amount Owing After Modification.</u>  After all note modifications referenced above, the amount owing on this loan is as follows:

| | |
|---|---|
| Principal | $290,951.07 |
| Interest | 0.00 |
| Advances Posted to Account | 0.00 |
| Fees and Charges Posted to Account | 0.00 |
| Arrearage Account | 0.00 |
| Unapplied Funds | 42.92 |
| Total | $290,908.15 |

6. <u>Refunds and Reimbursements.</u>  In the event Wilshire receives any funds from any third parties as a refund or reimbursement for any costs or charges that Wilshire has advanced on behalf of the Borrower(s), Wilshire shall not be required to refund such sums to the Borrower(s) and may apply such funds to the loan as it deems appropriate.

7. <u>Additional Charges and Final Payment.</u>  Additional Charges, if any, will be added to the Borrower(s)' account and shall be due as provided in the account statement. If Borrower(s) were in default, Wilshire may continue to incur cost arising from such default, including without limitation, costs to maintain contact with the Borrower(s) and to value or inspect the Property, at the cost of the Borrower(s). All other amounts remaining due under the Note and Deed of Trust/Mortgage, if any, after the monthly payments are made, shall be due and payable on the Maturity Date.

8. **Full Agreement/Amendment.**   Except for the modifications above, the Note and the Deed of Trust/Mortgage shall remain unchanged and the Borrower(s) ratify the Note and Deed of Trust/Mortgage as modified by this Agreement.  However, if the Note may be assumed by another person, the terms of this Loan Modification Agreement are not assumable unless required by law.  The Note and Deed of Trust/Mortgage as modified by this Agreement constitute the only agreement of the parties and supersede any prior discussions or proposed agreements or representations, whether made orally or in writing, including any prior loan modifications or payment plans.  This Agreement cannot be amended without the written consent of both parties.

9. **Default.**

   9.1 This Loan Modification is made by Wilshire with the assumption that all prior payments made by the Borrower(s) have been made with sufficient funds.  If any payments were not made with sufficient funds, Wilshire may void this Agreement.

   9.2 Borrower(s) agree to pay the Note according to the terms thereof as modified by this Agreement and to perform all of the acts to be performed by the Borrower(s) under the Deed of Trust/Mortgage.  Upon any default under the Note or Deed of Trust/Mortgage as modified by this Agreement, the owner of the Note, without waiver of any other remedies, shall have all rights provided in the Note and Deed of Trust/Mortgage and as provided by applicable law.  The term "Note" includes the original note and any riders, renewals, extensions, modifications and loan adjustments thereof.

10. **Assumption by New Owner.**  If the Borrower(s) acquired title to the Property after the Deed of Trust/Mortgage was in effect, Borrower(s) hereby agree to perform each and all of the obligations and covenants of the Note and Deed of Trust/Mortgage as modified by this Agreement to the same extent and with the same effect as if the Borrower(s) originally had executed all of these documents.

11. **Effect of Bankruptcy.**  If Borrower(s) received a discharge of the Loan debt in a bankruptcy proceeding and the debt has not been reaffirmed in bankruptcy court, Borrower(s) are not personally liable for the discharged debt, the Loan is non-recourse, and recovery will be limited to the collateral Property.

12. **Release of Claims.**  As consideration for the modification made herein, Borrower(s), on behalf of themselves, their heirs, executors, administrators and assigns, hereby, jointly and severally, knowingly and voluntarily, release, discharge and covenant not to sue Wilshire, any servicer of the loan, any owner(s) of the Loan, and any of their predecessors, successors and shareholders from any and all claims, demands, liabilities, defenses, setoffs, counterclaims, actions and causes of action of whatsoever kind or nature, whether known or unknown, whether legal or equitable, related or connected in any manner to the Note or Deed of Trust/Mortgage, which the Borrower(s) have or may have through the date of this Agreement.

If applicable, Borrower(s) voluntarily waive the provision of California Civil Code Section 1542, and any other provision or statute of like effect, which provides: *"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if know by him or her must have materially affected his or her settlement with the debtor."*

Borrower(s) warrant that they have read and understand the aforesaid Section 1542 and they have had the opportunity to consult with and be advised by counsel regarding its meaning and effect and they voluntarily waive its provisions and any other provisions or statute of like effect.

13. <u>Severability of Provisions</u>.  If any provision of this Agreement is determined under applicable law to be unenforceable, such provision shall be deemed to be severed from this Agreement, and all remaining provisions shall remain in full force and effect.

14. <u>Copies</u>.  Any copy of this Agreement shall be considered an original.

BORROWER(S)

By: *James Bulger*

Name: James Bulger

Date: *12-16-08*

By: *Gwendyn Bulger*

Name:

Date: *12/16/08*

WILSHIRE CREDIT CORPORATION    CHRIS TUFTS
Team Lead

By: _____

Name:

Wilshire Credit Corporation
14523 SW Millikan Way, Suite 200
Beaverton, Oregon 97005

New Search

| Block: | 333 | Prop Loc: | 142 PARK PL. | Owner: | BULGER, JAMES & GWENDOLYN L. | Square Ft: | 2683 |
| Lot: | 5 | District: | 0709 IRVINGTON | Street: | 142 PARK PLACE | Year Built: | 1926 |
| Qual: | | Class: | 2 | City State: | IRVINGTON, NEW JERSEY 07111 | Style: | |

Additional Information

| Prior Block: | | Acct Num: | 14040800 | Addl Lots: | | EPL Code: | 0 0 0 |
| Prior Lot: | | Mtg Acct: | | Land Desc: | 50 X 125 | Statute: | |
| Prior Qual: | | Bank Code: | 0 | Bldg Desc: | 2FAM | Initial: | 000000 Further: 000000 |
| Updated: | 03/04/09 | Tax Codes: | | Class4Cd: | 0 | Desc: | |
| Zone: | | Map Page: | | Acreage: | 0.1434 | Taxes: | 9435.16 / 0.00 |

Sale Information

| Sale Date: | 00/00/00 | Book: | | Page: | | Price: | 0 | NU#: | 0 |

| Sr1a | Date | Book | Page | Price | NU# | Ratio | Grantee |
|---|---|---|---|---|---|---|---|
| More Info | 02/24/00 | 5682 | 161 | 163000 | 10 | 0 | BULGER, JAMES & GWENDOLYN L |

TAX-LIST-HISTORY

| Year | Owner Information | Land/Imp/Tot | Exemption | Assessed | Property Class |
|---|---|---|---|---|---|
| 2019 | BULGER, JAMES & GWENDOLYN L.<br>142 PARK PLACE<br>IRVINGTON, NEW JERSEY 07111 | 26300<br>139200<br>165500 | 0 | 165500 | 2 |
| 2018 | BULGER, JAMES & GWENDOLYN L.<br>142 PARK PLACE<br>IRVINGTON, NEW JERSEY 07111 | 26300<br>139200<br>165500 | 0 | 165500 | 2 |
| 2017 | BULGER, JAMES & GWENDOLYN L.<br>142 PARK PLACE<br>IRVINGTON, NEW JERSEY 07111 | 26300<br>139200<br>165500 | 0 | 165500 | 2 |
| 2016 | BULGER, JAMES & GWENDOLYN L.<br>142 PARK PLACE<br>IRVINGTON, NEW JERSEY 07111 | 26300<br>139200<br>165500 | 0 | 165500 | 2 |

*Click Here for More History

Table of Equalized Valuations 2018
(As Amended by Tax Court Appeals)

| COUNTY AND DISTRICT | 1 AGG. ASSESSED VALUATION REAL PROP. * | 2 AVE. RATIO ASSESSED TO TRUE VALUE | 3 AGG. TRUE VALUE REAL PROP. * | 4 ASSESSED VALUE CLASS II R. R. PROPERTY | 5 ASSESSED VALUE ALL PERS. PROPERTY | 6 EQUALIZED VALUATION 2018 |
|---|---|---|---|---|---|---|
| **ESSEX COUNTY** | | | | | | |
| 0701 BELLEVILLE TWP | 2,676,100,030 | 94.10 | 2,843,889,511 | 0 | 6,565,100 | 2,850,454,611 |
| 0702 BLOOMFIELD TWP | 4,029,303,400 | 84.89 | 4,746,499,470 | 0 | 7,347,500 | 4,753,846,970 |
| 0703 CALDWELL BORO TWP | 1,025,011,900 | 89.25 | 1,148,472,717 | 0 | 3,164,000 | 1,151,636,717 |
| 0704 CEDAR GROVE TWP ** | 2,225,945,800 | 96.09 | 2,316,521,802 | 0 | 1,517,400 | 2,318,039,202 |
| 0705 EAST ORANGE CITY ** | 2,440,972,250 | 79.85 | 3,056,947,088 | 0 | 8,431,352 | 3,065,378,440 |
| 0706 ESSEX FELLS TWP | 821,673,500 | 102.73 | 799,837,925 | 0 | 248,500 | 800,086,425 |
| 0707 FAIRFIELD TWP | 2,576,288,980 | 82.56 | 3,120,505,063 | 0 | 7,336,353 | 3,127,841,416 |
| 0708 GLEN RIDGE TWP | 1,388,496,500 | 78.61 | 1,766,310,266 | 0 | 493,900 | 1,766,804,166 |
| 0709 IRVINGTON TWP | 1,803,559,100 | 89.12 | 2,023,742,258 | 0 | 7,840,400 | 2,031,582,658 |
| 0710 LIVINGSTON TWP | 7,306,661,395 | 84.96 | 8,600,001,642 | 0 | 9,534,432 | 8,609,536,074 |
| 0711 MAPLEWOOD TWP | 3,843,085,800 | 91.46 | 4,201,930,680 | 0 | 2,502,383 | 4,204,433,063 |
| 0712 MILLBURN TWP | 9,770,568,700 | 92.31 | 10,584,518,145 | 0 | 6,888,508 | 10,591,406,653 |
| 0713 MONTCLAIR TWP | 7,029,664,800 | 90.23 | 7,790,828,771 | 0 | 10,160,600 | 7,800,989,371 |
| 0714 NEWARK CITY ** | 11,960,067,700 | 80.42 | 14,872,006,590 | 0 | 73,099,500 | 14,945,106,090 |
| 0715 NORTH CALDWELL TWP | 1,611,442,600 | 89.33 | 1,803,920,967 | 0 | 461,900 | 1,804,382,867 |
| 0716 NUTLEY TWP | 3,268,882,000 | 85.42 | 3,826,834,465 | 0 | 9,100 | 3,826,843,565 |
| 0717 ORANGE CITY TWP | 1,288,515,800 | 85.53 | 1,506,507,424 | 0 | 2,526,100 | 1,509,033,524 |
| 0718 ROSELAND BORO ** | 1,669,792,300 | 93.11 | 1,793,354,420 | 0 | 1,634,100 | 1,794,988,520 |
| 0719 SOUTH ORANGE VILLAGE TWP | 2,836,053,100 | 94.10 | 3,013,871,520 | 0 | 4,802,476 | 3,018,673,996 |
| 0720 VERONA TWP | 2,020,300,700 | 81.33 | 2,484,078,077 | 0 | 1,335,400 | 2,485,413,477 |
| 0721 WEST CALDWELL TWP ** | 2,257,406,400 | 89.59 | 2,519,708,003 | 0 | 1,318,900 | 2,521,026,903 |
| 0722 WEST ORANGE TWP | 5,583,986,680 | 87.74 | 6,364,242,854 | 0 | 9,530,152 | 6,373,773,006 |
| | | | | | | |
| **ESSEX COUNTY** | 79,433,679,435 | 87.11 | 91,184,529,658 | 0 | 166,748,056 | 91,351,277,714 |

*Exclusive of Class II Railroad Property
** Amended by the Tax Court